I'm going to please the court. My name is Herbert Shelley and I'm the counsel for SKF. To please the court, I'd like to start with the model-match methodology issue first and discuss that. The floor court decision states that, quote, the standard by which this court reviews Commerce's decision is whether Commerce has reasonably determined that there were compelling reasons to revise the model-match methodology. This meant that this is not the appropriate standard for making a determination of whether the model-match change was reasonable or should have been adopted. A reasonable decision standard typically applies to when Commerce is interpreting an unambiguous statute or a statute which does not delineate the factors that they would use in making a determination. What standard do you consider to be appropriate? I think the appropriate standard, Your Honor, is substantial evidence on the record that Commerce had an obligation to provide compelling reasons or substantial evidence to support their decision to now change this model-match methodology after having 14 years of consecutive use of the family model-match methodology. Substantial evidence of what? Substantial evidence that the prior methodology was inappropriate, inappropriate, and inaccurate? There's nothing on the record to support or even argue. There have been arguments made by Commerce that the prior methodology was inaccurate or improper. The reasons given by Commerce for changing the methodology is that there is now available new computer technology which enables them to more precisely calculate a model-match that was not in effect in 1989 when they adopted the family methodology. We would submit that there is no substantial evidence to support that argument that they have made, that in fact, if you go back to 1989 and examine the situation with respect to other cases, that in fact, to some of the deviations methodology that they have now adopted was, in fact, applied to another Barron's case, Taper-Gilbert Barron's, which is an even complicated case. What precedent are you relying on for this substantial evidence standard? There are several cases, Your Honor, in which most of it is the IT cases. There is the Koyo-Seiko case in the Federal Circuit, the Hangzhou spring-washing case in which Judge Carman had determined that substantial evidence is necessary, citing actions in order to substantiate a model-match change. The Koyo-Seiko case of the Federal Circuit, 66, Feb. 3, 1204, which was a 1989 case, it was signed in 1995, but it dealt with 1989 entries in Taper-Gilbert Barron's, set forth the standard. It factually sets forth the standard of deviation policy that was being applied to that case, to those entries in Taper-Gilbert Barron's, which is almost identical to the factual situation and the standard now being applied to all Barron's. First, do you think that this substantial evidence standard is the standard for reviewing commerce's determinations? The question here is whether it was inappropriate for commerce, after a period of time, to adopt a different methodology when its ability, so it argues its ability, to make a calculation in a more accurate manner became available to it. What's wrong with commerce making a decision, even after a long period of time, that it now had the ability to more accurately make a determination, and therefore decided to use a better technique? Well, first, Your Honor, commerce does have the authority to change methodologies. It historically has that right and has exercised it, but it has to justify a reason for the court to understand the change in methodology and support its decision to change the methodology. We're submitting that in this case, there's no support for the determination. There's argument made to the court and argument made in the commerce determination that there is new technology that creates a more accurate determination. There's no determination. There's been no discussion of whether, in fact, the new methodology is more accurate. It's a different methodology. It results in different matches. Both the new and old family methodology were accurate. They just result in slightly different types of matches. So commerce can do it, but it has to justify it, and it has to do it with substantive evidence. We would, therefore, submit that in this situation, there is no evidence on the record that supports the commerce decision, and that, in fact, the evidence on the record, as seen in the point of determination of this court, which lays out in the factual section the standard deification methodology, applied in 1989 when commerce now says it did not have the computer capability to perform it. So in that case, it does not support the new argument that they did not have it because they, in fact, were doing it. The other reason that they've given for the change in methodology, the only other argument they've made, is that the new methodology supposedly results in a greater number of price-to-price comparisons, and that is a preference under the statute. The dumping statute does, in the hierarchy of price comparisons, indicate that price-to-price comparisons are the preferred methodology, but that has nothing to do with model-match methodology. The model-match criteria, in such a similar context in 19 SC 1677-16, where the criteria laid out for finding identical merchandise, does not use pricing as a criteria for making a physical model-match product. The model-match has to be made first before the pricing determination is considered. The model-match should not be used as a method to increase additional pricing comparisons. It's a technical comparison of products, thousands of different types of products, and there are physical characteristics that should be a determining factor in whether a proper match has been made. So the argument that this new methodology creates more price-to-price comparisons is not valid. The model-match should not be used as a methodology to create greater price-to-price comparisons. Commerce here argues that its revised methodology is simply a reasonable way for it to make these calculations, and aren't we required to give Commerce's decision substantial deference? Commerce's decision when it's interpreting the statute in determining what standard to apply is to be given substantial deference. That's a legal question, a question of law. We would argue that this determination, they made that determination when they adopted the original family methodology. They've made that determination now, but the link between the two is that they need to now explain and provide evidence why they are making a new interpretation. I agree with you, but I think they have provided an explanation. You may not agree that it's much of an explanation, but they have provided an explanation, and aren't we required to give that determination substantial deference? I think, Your Honor, that they've provided the explanation. They have not provided the evidence to support the explanation. And the evidence that's on the record shows that they could have done this in 1989, this methodology in 1989, contrary to what they say in their new methodology, and that, in fact, they could have done it then. The argument now that they could not have done it then is not supported, and the record does not support their new argument. The other issue with regard to this is the retroactive application of it. There's an argument that in spite of the determination that the final criteria on what methodology would be used and the criteria to be used was not actually finally articulated into the final determination in this particular administrative review. There was prior notice of the review that the methodology would be changed with some outlying parameters. Is there something different about this case than what was already decided on this issue? I don't see it, but if there is, maybe you could tell me what it is. Which one? The one you're talking about, is that correct?  Well, there is a difference, Your Honor. The retroactive cases, like Parkdale, which are cited in the brief, are issues when the anti-dumping statute is being applied and the assessed dumping duty is finally determined after the final administrative review is completed. So that's built into the statute, and you know that the prices that you've reported to the Congress Department are going to be the basis of your dumping margin. There is one calculation made, particularly in the constructed export price case, that uses as a denominator the import value of goods to calculate the initial deposit rate. The final assessment uses a different denominator, but the same criteria, the same pricing is used for the assessment rate for making the determination retroactively. In this case, there's been 14 years of a model-match methodology being relied upon by the industry in preparing data for these administrative reviews. We relied on that, and that is going to change. That is in the brief, but I didn't see that that made a whole lot of difference. But it might. You're in your rebuttal, and I don't know if you're going to regret the same thing. May it please the Court. The goal of any model-match methodology is a fine one. It is to create a matching system in which the matches are not so restrictive that Congress is forced to always resort to constructed value, but not so broad that the result is a huge number of dissimilar matches. And that is the goal that Congress uses every time it creates a model-match methodology, and it is the goal that it approached the variance cases with. During the investigation, Congress noted that its normal practice is to accept any number of dissimilarities, so long as those dissimilarities were capped by what Congress calls the difference in merchandise cap. What it learned was that the number of models present in the variance cases was so vast and so burdensome that at that time it simply couldn't use its normal methodology, and so it created what was essentially a compromise in order to handle the sheer number of models. Congress continually informed the parties that it would reconsider its decision should compelling reasons exist. Once Congress had the capability to perform a more accurate model-match, which it did in the early 2000s, it did so. And it gave the parties more than adequate notice. It started in 2003, notifying the parties that it was going to consider a change. And then over the course of the next two years, Congress provided the parties many, many opportunities to comment, provided the parties many, many updates as to where Congress's thinking was on the issue at various particular times. And then two years later, it issued the preliminary results in this administrative review, again allowing the parties to comment on the change in methodology, and then finally issued the final results. All Congress was required to do by statute was notify the parties in its preliminary results of a change in methodology. Mr. Shirley argues that Congress really had the better capability to calculate and make these computations several years before this change was actually implemented, which in a way suggests that the change was not a compelling reason. At least the ability to handle this on a different basis, reducing computers, et cetera, was not necessarily compelling. If they had that capability and had been doing it for several years, where am I wrong? Well, in response to some of the parties' comments, Congress did acknowledge that it had the right computer system as early as the late 90s in the 1998-1999 administrative review, which really is only a few years before the period of time when Congress decided to revise the methodology. But the more important point is that Congress is always obligated to create the most accurate dumping market. And regardless of how Commerce chooses to do so, if Commerce eventually realizes that there is a more accurate way to perform a model-match methodology, then Commerce is obviously obligated to investigate that, and that's exactly what happened here. The fact that the issue was raised to Commerce's attention by Timkin doesn't make the revision of the methodology any less justified, in fact. Well, the justification doesn't bother me. It's just where is it compelling that the change was made? Well, first of all, the Court's standard review is not whether the change was compelled. The Court's standard review is whether the revision to the model-match methodology was reasonable. I appreciate that. Now, Commerce has assured the parties from the very beginning that it wouldn't make change unless it found compelling reasons. Well, what are those compelling or what were those compelling reasons? Again, it goes back to the very purpose, the very delicate line that Commerce is walking when it is creating a model-match methodology. The family methodology resulted in a situation where Commerce was getting only 30% price-to-price comparisons and was resorting to constructive values 70% of the time. That means essentially 70% of the time there are no matches. Commerce isn't able to find any matches. In the new methodology, which actually retains many of the same characteristics of the family methodology, in the new methodology Commerce is able to match more than double what it was able to match before. Commerce has explained that those matches are reasonable. SKF has not pointed to one instance of a dissimilar match that would undermine the new methodology. All SKF points to is a sort of general argument that the new methodology is less accurate. But there's nothing less accurate about deviating from an old methodology that compared essentially an average to the United States model. Meaning that comparing the most similar match to the United States model is always going to be more accurate than comparing an average of a group to the United States model. Although SKF didn't raise the issue of zeroing, we'll give them an opportunity to say something on rebuttal if they wish. We would just like the Court to know that the issue is still pending at the WTO and as this Court has stated many times, until that process is completed and until the United States has determined whether and if to implement a change, there is nothing for this Court to do. Thank you. Any further questions? May it please the Court, just a few more words about the model match issue. On the compelling standards, we had some discussion about what that standard meant. The Commerce Department has explained what the standard meant and has applied it many times. All it means is that Commerce does not, in each annual review, have an issue or automatically revisit the model matches. It's not like with many other adjustments which always get attention in each review. They have to be re-examined and verified. Model match doesn't get re-examined every review. It is only, as Commerce has explained it, it is a compelling reason to be when we have additional products or the products have changed, obviously, or also if the parties come up with a better methodology. There's been a number of cases that illustrate how Commerce has applied that standard. There's a series of footnotes on page 33 of my brief that reviews various cases where Commerce has applied this compelling standard. Some of them, of course, are changes in the product, but some of them are simply parties come up with a better method. Most of these cases, I think, actually, I'm not sure that I've found anyone like my case, but most of these cases, the changes have been applied right away. In our case, this change was not applied right away, and I would have preferred, obviously, that it was applied right away in the 14th review rather than wait until the 15th review. The only reason that it wasn't applied in the 14th review is that Commerce had not collected the database that would have permitted it to apply the entire fully developed methodology. The second reason was that Commerce was very careful and intended to take everybody's comments into consideration as to what should be the final outline of the methodology. Most of the changes that were adopted in that long process were all changes suggested and discussed primarily by respondents because the basic outline of the new methodology had always been known. It's the sum of deviations methodology in its basic aspects is applied elsewhere, and it was, in fact, applied in the investigation, not by Commerce, but by the respondents. On the issue of why the new method is better, I would just like to point out that the record has very substantial evidence, very considerable evidence, regarding the nature of the family method in the sense that if you have a group of bearings that have all exactly the same size, and in other words, they are the same family of bearings, that you could still have very large differences in the cost of these bearings. We submitted affidavits and catalogs, and then we did analysis on the databases also to show this, that there were, in fact, big differences. For example, one of the affidavits, which is in the back of the joint appendix, explains that if you have a cage in there, which the model-matched family method doesn't really account for, that cage could bring up the price of the bearing by, say, 100%. Same is seals and shields also can bring up the price, not by 100%, but by some 20%. And the family method basically didn't take that into account, other than calculating an average price and then calculating an average adjustment, difference in merchandise adjustment. The new methodology does take it into account because it attempts to pick the single most similar product, which is, in my opinion, what the statute requires it to do, because the statute says you're supposed to, for the second category, the like product, you're supposed to find the product that is approximately equal in value. Well, if you just assume that all the family products are the same, which you know to be wrong, then that is a fundamental shortcoming in the family method. The new method, on the other hand, doesn't suffer from this same shortcoming because it tries to find, on the basis of valuable cost, the model that is most comparable to the U.S. model. And commerce, of course, has a long history of relying on cost to determine, as a proxy for commercial value. So there's no doubt that the new method is a far more accurate and is far more responsive to the statute, conforming with the statute, and is commerce's normal practice. Just a couple of points, Your Honor. The family methodology was adopted using commercial realities, technical realities in the bearing industry, to create the most similar product that could be matched. We used the eight major criteria of the bearing to create such a similar. An identical product in the bearing comparisons is those eight criteria plus five to six additional criteria that make it more precise. That methodology has not been changed and is still being utilized. And even that creates a virtual identical bearing because there are so many variations of bearings that you'll never get an identical match, per se. We submit that that is the more appropriate criteria for making a model match. By using some of these EHC methodology, you are moving into other bearings that would not commercially or mechanically be substitutable in the marketplace. You can get different bearings with different diameters, outer diameter, which would not be substitutable. But under the sudden deviation methodology, they could be considered a comparable merchandise, similar product, and utilized for comparison purposes. We would submit that the original methodology chosen by commerce and the reasons for it are more important than the new methodology. And as I mentioned earlier, the methodology, model match methodology should not be the controlling factor for determining what kind of pricing comparisons are made. The statute has a preference for which one should be used first, but model match is the primary initial consideration and matching the products comparably is the most important thing. If you have an average price, because you have several products that meet the criteria for a family model, the differences in outliers is taken care of when you average the prices. There's not an averaging of the model matching criteria. The average comes in the pricing of all the matches that come up in a family, and there's an average of pricing that will differ to take advantage or take account of the outliers. As to zeroing, our only point with zeroing is we think this panel should reconsider it. The issues that we've raised, the arguments we made, have not been considered in court. They have not been considered in Tinkin. They're different arguments, and we think that Chevron 1 is the appropriate standard to be utilized in examining the zeroing issue. And we would request that the panel consider this and, if appropriate, bring it to the attention of the full court on Bach and reconsider the issue of zeroing. The WTO is continuing to find the U.S. methodology as inconsistent with the international IDW agreement. Each time a panel issues a body, a determination contrary to the U.S. position, the U.S. government has adopted the panel recommendation. And that's the trend, and that's the change that's going on. And so we still think zeroing is an issue that should be right for consideration. Thank you.